FILED

UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

JUN 2 2 2012

Clerk, U.S. District & Bankruptcy
Courts for the District of Columbia

JANET MAVIS MARCUSSE,

Plaintiff,

v.

Case No. _____

UNITED STATES DEPARTMENT OF JUSTICE,
OFFICE OF INFORMATION POLICY, EXECU-
TIVE OFFICE OF UNITED STATES ATTOR-
NEYS, FEDERAL BUREAU OF INVESTIGATION,
DEPARTMENT OF THE TREASURY, INTERNAL
REVENUE SERVICE, BOARD OF GOVERNORS
OF THE FEDERAL RESERVE SYSTEM,

Case: 1:12-cv-01025
Assigned To : Kollar-Kotelly, Colleen
Assign. Date : 6/22/2012
Description: FOIA/Privacy Act

Defendants.

_____/

## COMPLAINT UNDER THE FREEDOM OF INFORMATION ACT

NOW COMES the Plaintiff, Janet Mavis Marcusse (hereinafter "Marcus-se"), as a pro se prisoner, alleging as follows:

### INTRODUCTION

1.  This is an action under the Freedom of Information Act ("FOIA"), 5 USC §552, et. seq., brought to seek access to records pertaining to the Plaintiff, Janet Mavis Marcusse, from Case No. 1:04-cr-165, in the United States District Court, Western District of Michigan, Southern Division.

2.  In order to obtain a grand jury indictment, conduct their criminal trial, and pursue a direct appeal, the Office of U.S. Attorney, CI Division IRS Agents, and FBI Agents in the Western District of Michigan engaged in evidence tampering with their chief exhibits to promote a nonexistent crime after the first grand jury did not return an indict-ment, fabricated unreported income claims to invent motive, and destroyed documents and records or refused to produce documents and records in response to a discovery order from U.S. Tax Court.

3.  Such activity not only constitutes governmental wrongdoing, which is a matter of public interest, but criminal conduct, including con-

- 5 2012

spiracy criminal activity.

4. It is a crime under 18 USC §1519 to destroy, alter, or falsify records or documents with the intent to influence a federal investigation. Under 18 USC §2071, it is a crime to conceal, remove, or mutilate records or documents filed with a court or held in an officer's custody. It is a crime under 26 USC §7214 for a revenue officer or agent to knowingly demand other or greater sums than are authorized by law.

5. It is recognized by the courts that the public interest in disclosure under FOIA is greatest when there is evidence of governmental wrongdoing. **Lissener v. United States Customs Service**, 241 F 3d 1220 (CA9 2001). The public has an interest in knowing whether the federal government was withholding information that could corroborate a claim of innocence and that interest outweighs privacy interests. **Roth v. United States DOJ**, 642 F 3d 1161 (D.C. Cir. 2011). A Glomar response can be overcome by the inmate's showing that a reasonable person could believe that the FBI was withholding information that could exonerate him. **Id.** Where an informant's status has been officially confirmed, a Glomar response is unavailable, and the agency must acknowledge the existence of any responsive records it holds. **Boyd v. Crim. Div. of the United States DOJ**, 475 F 3d 381 (D.C. Cir. 2006).

6. The United States Court of Appeals for the District of Columbia Circuit has held the common law right of access extends beyond judicial records to the "public records" of all three branches of government. **Ctr. for Nat'l Sec. Studies v. United States DOJ**, 331 F 3d 918 (D.C. Cir. 2002). The Supreme Court held in **Nixon v. Warner Communication, Inc.**, 435 US 589, 597 (1978), that "the courts of this country recognize a general right to inspect and copy public records and documents, including judicial documents. **Id.**, at 936.

## THE PARTIES

7.  Janet Mavis Marcusse is a prisoner, who is presently incarcerated at the Federal Correctional Institution, 501 Capital Circle, NE, Tallahassee, Florida 32301.

8.  Defendants United States Department of Justice, Office of Information Policy, Executive Office of United States Attorneys, Federal Bureau of Investigation, Department of the Treasury, and Internal Revenue Service are departments within the executive branch of the United States government.  Defendant Board of Governors of the Federal Reserve System is not an executive department, but an independent establishment in the executive branch of government.  All of the defendants are agencies of the United States within the meaning of 5 USC §552(f)(1).

## JURISDICTION AND VENUE

9.  This Court has subject matter jurisdiction over this action and personal jurisdiction over the defendants pursuant to 5 USC §§ 552(a)(4)(B) and 552(a)(6)(E)(iii).  This Court also has jurisdiction pursuant to 28 USC §1331 and 5 USC §§ 701-706.

10. Venue is premised on defendants' location in Washington, D.C., and is proper in this district under 5 USC §552(a)(4)(B).

## FACTS

11. In a Motion and Order to Unseal Case dated July 12, 2004, it was disclosed the first grand jury had expired on August 29, 2003, without having voted to return an indictment.  Initially, the allegation was publicly made in the media that Marcusse had lost millions in investments.  It is only after the allegation is changed to a "Ponzi scheme" in which no investments were made that an indictment is obtained from a different grand jury on July 29, 2004.

12. The criminal trial alleging a "Ponzi scheme" of no investments made was conducted in May and June, 2005.  Marcusse had expected to be ac-

quitted through the defense that "the bank records show the money was invested with other individuals", who had defrauded her, except the trial judge told her she could not use this defense. When she questioned the ruling in light of the fact the court admitted she was charged with running a Ponzi scheme, she was denied the right to proceed pro se. Court-appointed counsel was asked by the court to explain that she could "look at" and "review" the bulk bank records IRS agent "investigative" witnesses would be using in support of their one-page summary exhibits, but neither counsel nor the court would respond to her question of whether she could "use" the bank records in her defense.[1]

13. Motive, which was used in the jury instructions in support of the element of "intent to defraud", was fabricated by IRS agent witnesses, who alleged $4.8 million in unreported income claims in summary exhibit, GX-171, and an additional $7.3 million in "spending" by the defendants "on themselves and others" in summary exhibit, GX-172.

14. Under cross, IRS Agent James Flink evasively admits to employing a bizarre definition for "investments" in which it was limited to the prime bank debenture product described in Government Exhibit No. 1 ("GX-1"), thereby allowing the IRS witnesses to deny stocks, real estate, and other commonly recognized investments were in fact "investments".

15. GX-1 was a product investor testimony and investor newsletters proved had been withdrawn prior to the first of 39 mail fraud counts, ranging in time from October 21, 1999, to March 23, 2001. Out of the 36 investor witnesses at trial, including 10 for the defendants, not one of them testified to having been promised GX-1 during the time of any mail fraud count. Under cross, Agent Flink even admitted GX-1 was not the product that had been promised to the investors.

---

[1] Previously, in **United States v. Modena**, 302 F 3d 626, 633 (CA6 2002), this same trial judge was held to have erred by allowing prosecutors to place restrictions on the Rule 1006 source documents used by the IRS in support of their summary exhibits.

16. Marcusse testified to $12.3 million in investments made, except when counsel tried to submit bank records in support of her summary exhibits, prosecutors and IRS agents repeatedly obstructed it by misrepresenting the documents were not from the admitted bulk exhibits.  These exhibits had been placed in banker boxes, stacked in front of the jury, and used by IRS agents to point to in response to questions requesting specifics in support of their one-page summary exhibits.

17. Rather than contacting the relevant banks, under pressure from prosecutors, counsel agreed to "delete" the bank records in question.  Immediately following the trial, this attorney was made Senior Litigator for the Office of Public Defender.[2] With no criminal history, Marcusse had been denied pretrial bond so she was unable to contact any banks.

18. In litigation Marcusse filed against the Commissioner of the Internal Revenue Service in U.S. Tax Court after the trial, requesting a redetermination of all of the unreported income claims made against her for fraud and unclean hands, the IRS Office of Chief Counsel provided some of the exact same bank record documents in discovery that had been falsely claimed to the criminal court as not from the bulk bank records. According to the Office of Chief Counsel, these documents were provided by CI Division IRS Agent Stephen Corcoran from the Western District of Michigan on November 30, 2010.[3]  Refer to Docket 14234-09.

19. Marcusse was also denied 14 defense witnesses, including all direct witnesses to investments, where the court held "alleged investments" were "irrelevant" to the charges.  This suggests GX-1 had been made an irrebuttable presumption, which was an abuse of discretion.

20. In defense closing arguments, the government's own witnesses and

---

[2] Previously, this attorney had been in private practice and had just emerged from Chapter 7 personal bankruptcy at the time of the indictment against Marcusse.

[3] Along with Agent Flink, Agent Corcoran testified in the capacity as a government "investigator" at the 2005 criminal trial.

and evidence were used to establish at least $7.5 million in investments had been made in support of Marcusse's testimony.

21. In rebuttal closing, prosecutors withdraw the ponzi scheme as the "scheme to defraud" element, and switch the charges of mail fraud and money laundering to rest upon GX-1 having been "promised" to investors, but the defendants misrepresented the program by not investing in it.

22. The product prosecutors describe as being GX-1 in rebuttal closing combined some of the characteristics of the stock trading program with the prime bank debenture product contained in GX-1 to create a nonexistent product never offered to investors in order to insure convictions. This caused the case to rest upon evidence tampering.

23. The record shows prosecutors tampered with their chief exhibits, such as GX-1, GX-2, GX-3, GX-31, and GX-33, as now substantiated by the new prosecutors assigned to the case, which is currently pending in a §2255 proceeding.[4]  This evidence tampering was conducted in order to allege the investment products being promised by the defendants were illegal prime bank or high yield debentures, rather than stocks and other legitimate products, which allowed prosecutors to obstruct the evidence of third-party culpability as irrelevant.

---

[4] Examples of evidence tampering include where the investor contract granting discretion over the choice of investments made to the defendants, which belonged to the stock investment program, was falsely incorporated into GX-1 prior to submission by prosecutors to render the contract void as fraudulent.  While Marcusse had objected to GX-1 as irrelevant at her detention/preliminary hearing, she was not permitted to make objections at the criminal trial in 2005.  GX-31, a June, 1999 investor newsletter, disclosed the investments would be custodied at Suisse Security Bank & Trust ("SSBT"), except prosecutors removed several pages from it, including the wiring instructions to the account at SSBT.  One of the "red flags" of a prime bank fraud, according to Leonard Zawistowski, the government's "expert" witness at trial, is not specifying the bank.  GX-33, an October, 1999 investor newsletter, advised that the bank debenture program (GX-1) had been withdrawn and the investments were now in stocks.  Several pages were also removed from this 8-page exhibit before submission by prosecutors, including one page that was made into GX-3 and placed next to GX-1 to make it appear as if it was the same type of product as GX-1 (GX-2 was another version of GX-3).  In an October 14, 2011 Response to Marcusse's §2255 brief raising evidence tampering as an issue, the Office of U.S. Attorney admits GX-33 was 8 pages, describing them, except the trial transcript proves in several places the GX-33 submitted at trial did not include all of these pages and that GX-3 was a one-page exhibit.  As the result, prosecutors claim on December 22, 2011 in response to

24. None of the court-appointed defense attorneys would request a directed order of acquittal on the withdrawn ponzi scheme charge.  None of the court-appointed attorneys would object to prosecutors amending the charge in rebuttal closing or to the jury instructions amending the "scheme to defraud" element to honest services fraud.

25. Marcusse was found guilty and sentenced to 25 years as a first-time "offender", $310,722 in restitution to the IRS, and $12,651,244.80 in restitution to investors.

26. Upon direct appeal to the Sixth Circuit Court of Appeals, in Case No. 05-2586, new court-appointed counsel was assigned to Marcusse.  She was also granted permission to file a pro se supplemental brief after objecting to counsel's proof brief where the facts were substantially misrepresented and key issues omitted.

27. After counsel shows up drunk to the 9:00 a.m. oral arguments,[5] rendering the few issues he did raise as harmless due to additional misrepresentations of the underlying record, Marcusse files a petition for writ of mandamus to strike his appellant proof and final briefs and oral arguments from the record, opening Case No. 08-1003.  The petition is denied when the trial judge does not respond as invited.

28. On February 14, 2008, the convictions and sentences are affirmed by the Sixth Circuit in an Opinion where Marcusse's pro se issues were ignored, including erroneous trial rulings, such as the denial of the **Faretta** right, denial of 14 defense witnesses, amended jury instructions, and restrictions on the use of admitted bank record documents.

29. In response to a pro se petition for rehearing, which raised the

[4] (Cont.)  co-defendant William Flynn's §2255 brief raising the same issue, that even if the exhibit was missing pages, it was of "no consequence".  To the contrary, the entire case relied upon the investment product promoted being shown to be an illegal prime bank or high yield fraud.

[5] In his sworn affidavit responding to ineffective assistance on appeal, he does not deny the accusation he appeared drunk at oral arguments.

issue the pro se grounds had not been considered, the panel attests they had "fully considered" the issues, denying the petition on May 20, 2008.

30. In response to a petition for recall of the mandate, raising attorney and court fraud pursuant to Rule 60(b), the appellate panel reverses course, admitting on May 14, 2009, after the petition for writ of certiorari was denied, that they had "declined" to consider the pro se issues because Marcusse had "representation", but that an "adequate, alternative remedy" was to file a motion to vacate under §2255.

31. On April 6, 2011, precedent is changed in the Sixth Circuit in a published opinion, where **United States v. Williams**, 641 F 3d 758 (CA6 2011), holds, "Because Williams was represented by counsel on this appeal, we decline to address these pro se arguments." Previously, judicial misconduct complaints had also been submitted, alleging bias where a search of the public record showed that, in every other direct appeal, or in 320 other cases, the issues of a pro se appellant with representation had in fact been considered.[6]

32. Motions to vacate the convictions and sentences pursuant to 28 USC §2255 are currently pending in the Western District of Michigan pertaining to Marcusse in Case No. 1:09-cv-913, and two of her co-defendants, George Besser (Case No. 1:09-cv-948), and William Flynn (Case No. 1:09-cv-415). Another co-defendant, Donald Buffin, was granted a certificate of appealability in the Sixth Circuit Court of Appeals in Case No. 10-2167.

33. Judgment was recently awarded in Marcusse's favor in U.S. Tax Court in Docket 14234-09, Washington, D.C., on January 31, 2012, reducing the $936,626 in alleged unreported income claims to zero deficiencies and zero penalties regarding the same tax years, 1999-2001, as the criminal trial where this identical claim had been used to invent motive in front

---

[6] Cases in which an **Anders** brief was submitted were not counted.

the jury in support of the element of "intent to defraud".

34. Unlike the 2005 criminal trial, in U.S. Tax Court, Marcusse was allowed to proceed without the "benefit" of court-appointed counsel.

35. On January 6, 2012, the IRS Office of Chief Counsel filed a Motion for Entry of Decision in Marcusse's favor, requesting the 1999-2001 tax year alleged deficiencies be reduced to zero due to the "inability to rely on the evidentiary foundations established in petitioner's criminal case."

36. Unlike the 2005 criminal trial, in U.S. Tax Court, Marcusse was allowed to not only pursue documents in discovery motions, including from the bulk bank record exhibits, but to use them on the record to establish the unreported income claims against her consisted of funds that instead had been invested with others, just as she had previously testified at the 2005 trial.

37. On January 6, 2012, the IRS Office of Chief Counsel also filed a Motion to Vacate the Court's November 10, 2011 Order for discovery in light of the request for entry of decision in Marcusse's favor. This pleading disclosed that the Criminal Chief of the United States Attorneys' Office in the Western District of Michigan, Brian Delaney, had admitted on February 16, 2011, to purging documents in regards to Marcusse's case. This destruction of records occurred immediately following the Office of Chief Counsel making specific requests for documents from Kristina Zelasko in Delaney's office on February 14, 2011. On January 5, 2011, Judge Gustafson in U.S. Tax Court had ordered the IRS to produce various documents.

38. Prior to the convictions becoming final on direct appeal, Marcusse notified the IRS she would be contesting their Notice of Deficiency, which cited as its "lead source" the 2005 criminal trial.

39. According to the IRS Office of Chief Counsel, Brian Delaney repre-

sented that "purged documents would likely remain with their original investigative agencies".

40. Published caselaw appears to indicate that an Office of U.S. Attorney is expected to retain documents in a criminal case for 10 years, a requirement which was not met in Marcusse's case.  In any event, at all times since the indictment, the case has had litigation pending against it.

41. In response to FOIA requests and in the U.S. Tax Court litigation, various federal agencies have made different representations as to where documents are being maintained, such as the bulk bank records, except when the location is identified and specific requests are made, the records are not available to be produced.

42. While Marcusse was entitled to documents from the bulk bank records relevant to her unreported income claims in U.S. Tax Court,[7] the IRS would not produce documents from these exhibits relevant to the alleged ponzi scheme charge, which claimed no investments were made.  This false charge was resurrected immediately following the jury verdict from the 2005 criminal trial by prosecutors to the media.  The defendants were sentenced based on a crime described as a "Ponzi scheme".  The "law" utilized by the IRS in support of unreported income under IRC Section 61 - Gross Income was a "Ponzi scheme" in their March 12, 2009 Notice of Deficiency, as litigated in U.S. Tax Court, and as represented to be from the 2005 criminal trial.  On direct appeal, the Office of U.S. Attorney represented the jury had found a "Ponzi scheme", omitting the fact the record showed they had withdrawn this element prior to jury deliberations.  According to published precedent, this should have rendered it an implied acquittal.  See **Saylor v. Cornelius**, 845 F 2d 1401

---

[7] Co-defendants William Flynn and George Besser both provided Form 8821 to the IRS to authorize Marcusse access to all documents relevant to their tax liability for tax years 1998-2001.

(CA6 1988); **United States v. Hoeffner**, 626 F 3d 857 (CA5 2010); **Livingston v. Murdaugh**, 183 F 3d 300 (CA4 1999).

43. It is Marcusse's firm belief, therefore, that the government engaged in deliberate and knowing misconduct, including what appears to be criminal activity, in obtaining the grand jury indictments, conducting the 2005 criminal trial, and pursuing the direct appeal to the Sixth Circuit Court of Appeals.

44. Marcusse further alleges that her investors, the individuals labeled as victims in her criminal case, have been substantially misled and mistreated by the U.S. Attorneys Office in the Western District of Michigan where their claims were solicited for subrogation through the false allegations she was operating a ponzi scheme where no investments had been made, because it cheated each and every one of these individuals out of legitimate restitution.

45. Out of a total investor restitution judgment of $12,651,244.80, a total of $168,901.06 has been collected and disbursed from the 8 defendants charged in Marcusse's case, as disclosed by Susan Gerson, EOUSA, under a FOIA response. The public has the right to know how the U.S. Department of Justice treats the victims of alleged crimes.

46. Individuals, such as Robert Plaster (now deceased), a friend of former U.S. Attorney General John Ashcroft, the Attorney General who was in power at the time of the indictments filed against Marcusse, admitted at the 2005 criminal trial to keeping funds obtained from MLC Development ("MLC"), a company in which investor funds had been placed for investment. Evidence obtained since the trial indicates Plaster misrepresented his real estate could be utilized for MLC's "Showcase Branson Project" when the Stone County Commissioner's Office had repeatedly denied him permission to rezone the property.

47. One of the defense witnesses denied was David Pointer, an attorney

-11-

wno had agreed to pursue litigation against Plaster no matter the out-
come of the criminal trial, except afterwards, he refused to do so.
Another was attorney Darwin Kal, where an identical situation existed.
48. It is Marcusse's firm belief both Pointer and Kal were intimidated
by federal officials after they were identified as defense witnesses
and the nature of their testimony identified.
49. Entities, such as Suisse Security Bank & Trust ("SSBT"), in which
investor funds were placed in a managed stock trading program, were be-
lieved by Marcusse to have been endorsed in writing by FBI Agent Gerard
Forrester, except when she requested a subpoena for him for trial, the
Office of U.S. Attorney represented to the court Forrester's "existence"
was of "doubtful validity" and that Marcusse had fabricated his endorse-
ment letters, causing the court to deny him as a defense witness.  Re-
quests for information under FOIA after the trial resulted in the FBI
refusing to confirm or deny the existence of records regarding Forrester.
In U.S. Tax Court, however, on June 17, 2011, Agent Forrester's federal
employment and two endorsement letters were authenticated (Docket 14234-09).
50. After Agent Forrester's endorsement letters of February 11, 2000, and
January 10, 2001, the Central Bank of the Bahamas revoked the license of
SSBT on March 5, 2001, freezing all deposits.  On August 4, 2002, SSBT's
Provisional Liquidator reported that the bank's management, shareholders,
and directors had absconded with $31,481,295 in bank assets.  When Mar-
cusse tried to submit a copy of this Report at the criminal trial, prose-
cutors objected and the court sustained it.
51. On August 25, 2004, after Marcusse's arrest and detention without
bond, Minister Roberts with the Bahamian government reported that "re-
tired" Special Agent Gerard Forrester attended a court hearing in the
Bahamas with Mohammed Harajchi, the owner of SSBT.  The affairs of SSBT
have never been settled, nor have any of its management, shareholders,

-12-

or directors ever been criminally prosecuted.

52. At trial, government "expert" witness, Leonard Zawistowski, of the Federal Reserve, admitted under cross that his employer had been involved in causing the "collapse" of SSBT, except when the trial transcript was published on August 18, 2005, three months after his May 19, 2005 testimony, this admittance was now missing.

53. References to Zawistowski's admittance were made 5 times afterwards, except these references were not similarly removed. Had the admittance not in fact occurred, prosecutors would have objected to references made to it, which the published trial transcript shows did not occur. In addition, Marcusse made references to Zawistowski's admittance two more times in her May 24, 2005, motion requesting subpoenas for defense witnesses.

54. In his November 30, 2011 Order in U.S. Tax Court, Judge Gustafson ordered the IRS produce the balance of documents not already produced, as ordered on January 5, 2011, including the shorthand notes or other original records from the court reporter regarding Zawistowski's admittance in light of the seven references to it remaining in the record.

55. In his Motion to Vacate the Court's November 30, 2011 Order, Office of Chief Counsel attorney Jonathan Hauck relates that he contacted court reporter, Kevin Gaugier, on January 3, 2012, only to conclude, "Respondent's counsel has reviewed the documentation available, and has not been able to locate the shorthand notes and other original notes of either Mr. Zawistowski or Mr. Gaugier that he has been ordered to produce."

56. These original documents, required to be maintained in the public record for 10 years under 28 USC §753(b), were also requested under FOIA, but not provided.

57. After the trial, a Senate investigative report was discovered, which was entitled, "Correspondent Banking: A Gateway for Money Laundering", that disclosed, "Bahamian bank regulators provided a September 15, 2000

letter stating that an external audit of SSBT had 'ruled out any possi-
bility of irregularity on the part of [SSBT].'"  The Report went on to
indicate "possibly fraudulent promises to pay extravagant returns and
possibly fraudulent misuse of investor funds" had occurred (p. 276).

58. Banking transactions, which were handled by Marcusse's business at-
torney, Gurmail Sidhu, included a $1.2 million wire transfer to MLC
that Robert Plaster pocketed.  On July 11, 2004, after Marcusse's July
1, 2004 arrest, it was reported in the media that Mr. Sidhu's home and
office had been "raided" under a "drug-trafficking" search warrant, nam-
ing Marcusse's company.  No relevant search warrant or sworn affidavit
ever appeared in the public record in Marcusse's case.  No criminal activ-
ity regarding drugs or drug-trafficking was ever alleged in regards to
Marcusse or her co-defendants.  No copies of the business and banking
records seized from Mr. Sidhu were ever provided by prosecutors to Mar-
cusse and instead were withheld from the trial.

59. Mr. Sidhu would not respond to any inquiries from Marcusse, suggest-
ing that he too had been intimidated by federal authorities.

60. In his November 30, 2011 Order in U.S. Tax Court, Judge Gustafson
ordered the IRS to produce a copy of the Sidhu search warrant and docu-
ments seized.

61. In his Motion to Vacate the Court's November 30, 2011 Order, attor-
ney Jonathan Hauck relates that he contacted the IRS's Criminal Investi-
gation Division, the United States Attorney's Office for the Western
District of Michigan, and the Federal Bureau of Investigation, but he
"has not been able to locate the documents that he has been ordered to
produce."

62. A copy of the search warrant, affidavit, and inventory of items
seized from attorney Gurmail Sidhu was requested under FOIA, but not
provided.

63. It is Marcusse's firm belief that ponzi scheme allegations against her charging no investments were made acted to insure Robert Plaster would not be criminally charged nor incur any civil liability to the investors.

64. It is Marcusse's firm belief that ponzi scheme allegations against her charging no investments were made protected the federal government's unclean hands in pursuing any criminal charges against her where she relied upon Agent Forrester's assurances SSBT was not engaging in prime bank or high yield fraud or in money laundering of the same.

65. On December 5, 2011, Judge Gustafson in U.S. Tax Court ordered that pretrial briefs be submitted no later than February 13, 2012, indicating that, if necessary, the trial would be held in "petitioner's prison".

66. It is Marcusse's firm belief that the Office of Chief Counsel conceded the case in full to avoid going to trial where convictions based upon fabricated unreported income claims would be at risk and evidence of governmental wrongdoing would be exposed, including of criminal activity.

67. Ordinarily, federal officials are entitled to a presumption that they properly discharged their duties. See **Bracy v. Gramley**, 520 US 899 (1997). In Marcusse's case, federal officials are not entitled to such a presumption.

68. Media reports and admittances by FBI employees indicate that not all evidence and documents are uploaded into the FBI's Computerized Record System. Specifically, that evidence goes first into an "I Drive", and some evidence, evidence that is embarrassing to the Bureau, never is uploaded to the CRS. There is also another Drive known as the "S-Drive", which is a secret maintenance system.

69. In Marcusse's case, all of the defendants have cause to hide documents.

70. The documents requested under FOIA should have been produced as requested.

71. Of those documents that were produced, there is now evidence available to suggest the defendants did not engage in good faith in so doing. Documents provided have subsequently been used to prove evidence of governmental wrongoing in support of the motions to vacate the convictions under §2255, except the Office of U.S. Attorney in the Western District of Michigan is now protesting the documents are not correct.  IF EOUSA provided documents in response to a specific FOIA request, which were obtained from the Office of U.S. Attorney in the Western District of Michigan, either the documents should be presumed correct or Marcusse should now be entitled by court order to be provided with the correct documents.

72. Marcusse has exhausted her administrative remedies.

## FIRST CAUSE OF ACTION

73. As Item 1 of an October 6, 2009 FOIA request, the list of 577 investors and $20.7 million of investor deposits, including the names, dates, and amounts, were requested.  In his July 29, 2004 indictment, Assistant U.S. Attorney ("AUSA") Tom Gezon charged these figures, and IRS Agent Flink attested to them under penalty of perjury, submitting a one-page summary exhibit, GX-170, in support, which represented the figures were supported by the underlying bulk bank record exhibits.

74. In his April 13, 2010 response, William Stewart II, EOUSA, provided government trial exhibit, GX-84, which was a copy of Marcusse's business records dated July, 2002, containing 537 investors and stating $18,793,173.09 as the "Total Amount of Investments".  This response was appealed because, if true, it demonstrated Agent Flink committed perjury at the criminal trial by overstating the totals by $1,906,827 ($20.7 million vs. $18,793,173.07) and 40 investors (577 vs. 537).

In response, Janice Galli McLeod of the Office of Information Policy stated that EOUSA's response was "correct", and that it had conducted an "adequate, reasonable search for records responsive" to the request.

75. In a December 22, 2011 response to a §2255 motion to vacate (Case No. 1:09-cv-415), however, which had submitted Mr. Stewart's FOIA response as evidence of IRS perjury and falsified summary exhibits, AUSA McManus and Donald Davis, U.S. Attorney, Western District of Michigan, now represent to the criminal court that the FOIA response "does not in any way suggest that Agent Flink 'lied' at trial" (p. 27).

76. If AUSA McManus is being honest, then the documents provided by the Office of U.S. Attorney in the Western District of Michigan to EOUSA were incomplete or not correct as represented by EOUSA.  The record shows Agent Flink testified to having constructed a "list" to support his allegations, which should be produced to support the entire amount to which he testified.  Defendant's failure to make this document available violates FOIA, 5 USC §§ 552(a)(3)(A) and 552(a)(6)(E).

### SECOND CAUSE OF ACTION

77. As Item 2 of an October 6, 2009 FOIA request, the specifics were requested for Agent Flink's one-page summary exhibit, GX-172, which purported to prove the underlying bank records supported his testimony that $7.3 million was "other spending" by the defendants.

78. In his April 13, 2010 response, William Stewart II, EOUSA, provided a copy of GX-172, the bank account opening documents for 10 of the 14 bank accounts cited in support of GX-172, and copies of 10 checks totaling $232,425.87.  Payee names, amounts, dates, or where wire transfers were sent had been requested.  Mr. Stewart's response was appealed, because, if true, it demonstrated Agent Flink committed perjury about at least $7,148,165.91 in "other spending".  The objection was also raised that the 10 checks constituted "double counting", as they had

also been utilized to construct summary exhibit, GX-171, causing all of the $7.3 million to be a false allegation.  In response, Janice Galli McLeod of the Office of Information Policy stated that EOUSA's response was "correct", and that it had conducted an "adequate, reasonable search for records responsive" to the request.

79. In a December 22, 2011 response to a §2255 motion to vacate (Case No. 1:09-cv-415), which had submitted Mr. Stewart's FOIA response as evidence of IRS perjury and falsified summary exhibits, AUSA McManus and Donald Davis, U.S. Attorney, Western District of Michigan, now represent to the criminal court that, "He appears to focus on the checks, to the exclusion of the bulk bank records", further arguing, "nothing produced in response to the FOIA request gives rise to collateral relief" (p. 27, ft. 6), thereby contradicting the responses from EOUSA and the Office of Informa-tion Policy proving otherwise.

80. If AUSA McManus is being honest, then the documents provided by the Office of U.S. Attorney to EOUSA were incomplete or not correct as rep-resented.   The record shows Agent Flink testified at trial that, "$7 million is what these individuals who were operating this pulled out from investor monies," and in breaking down the $7 million when asked, "These were checks to individual -- individual people."  If Agent Flink indeed had $7 million in "checks" to support his summary exhibit, GX-172, as he swore under oath, they should all be produced.  Defendant's failure to make these documents available violates FOIA, 5 USC §§ 552(a)(3)(A) and 552(a)(6)(E).

### THIRD CAUSE OF ACTION

81. As Item 3 of an October 6, 2009 FOIA request, the list of the 70 to 80 bank accounts to which Agent Flink testified at trial had been "ana-lyzed" was requested.

82. In his April 13, 2010 response, William Stewart II, EOUSA, provided

a copy of GX-170 and GX-172, two summary exhibits, which referred to 21 bulk bank accounts. Agent Flink testified there was no legitimate reason for the defendants to have used so many bank accounts. At trial, bulk bank record exhibit numbers are assigned to only 38 different accounts (GX-201 through GX-238), which for 8 defendants would not have been unpropitious where each had both personal and business accounts.

83. The documentation to prove the existence of at least 32, and maybe as many as 42 bank accounts, which IRS "investigative" witnesses had sworn under oath were "analyzed", were not produced as requested. Defendant's failure to make this list available violates FOIA, 5 USC §§ 552 (a)(3)(A) and 552(a)(6)(E).

## FOURTH CAUSE OF ACTION

84. As Item 4 of an October 6, 2009 FOIA request, the specifics, including names, amounts, and dates, were requested for Agent Flink's testimony and one-page summary exhibit, GX-170, which stated $8.4 million was paid to investors.

85. The superseding indictment listed the number of investors, total paid, and date, specifying the month and year, totaling $8,132,494.50 (R. 323, Ct. 40, ¶1(a)-(pp),[8] which shows this amount was changed to $8.4 million for the trial.

86. In his April 13, 2010 response, William Stewart II, EOUSA, does not provide any documents in support of this item. When appealed, Janice Galli McLeod responded that an "adequate, reasonable search for records responsive" to the request had been conducted.

87. In light of the fact that the specific figures charged in the indictment do not match the evidence and testimony presented at trial, defen-

---

[8] AUSA Gezon requests to present a "reformatted" superseding indictment at the final pretrial hearing on May 5, 2005, just 11 days before the trial started on May 16 (R. 651, TR 35). At the same time, they distributed their proposed trial exhibits, which did not match the allegations in the "reformatted" superseding indictment, suggesting they knew they were submitting knowingly false trial exhibits, but it was of no concern.

dant's failure to provide the specifics as requested violates FOIA, 5

USC §§ 552(a)(3)(A) and 552(a)(6)(E).

### FIFTH CAUSE OF ACTION

88. In an October 6, 2009 FOIA request, specific bank record documents

from the bulk bank record exhibits, which had been in the government's

custody at the criminal trial, were requested in Items 5,[9] 6,[10] 7,[11]

11,[12] 13,[13] and 14.[14]

---

[9] Item 5 requested the wire transfer records to match Def. Exh. M-AA from the crimi-
nal trial, which was in support of Marcusse's testimony $4,226,000 was invested in
the Suisse Security Bank & Trust managed stock trading program.  While these wire
transfer records were obtained from the bulk bank record exhibits and given to court-
appointed counsel, he would not submit them due to pressure from prosecutors.  In
closing arguments, AUSA Gezon misrepresents the underlying bank exhibits, claim-
ing there were no bank records to support Marcusse's testimony this investment was made.

[10] Item 6 requested the account opening statements for Agent Flink's GX-219 exhibit
for Worldwide "E" Capital, LLC, and the receipts for withdrawals signed by Winfield
Moon, the owner of Worldwide.  At the criminal trial, $600,000 of the $1,861,330 in-
vested with Moon was misrepresented by Agent Flink as unreported income to Marcusse
to invent motive in front of the jury.  AUSA Gezon misrepresents to the court the
bank record documents Marcusse was trying to submit were not from the bulk bank re-
cord exhibits, causing her to be deprived of the evidence necessary to prove she did
not personally obtain and spend the funds.  During cross examination, AUSA Schipper
inferred she stole this $600,000 from the investors and gambled it away in Las Vegas.
In U.S. Tax Court, Docket 14234-09, on January 5, 2011, the Court ordered the IRS Of-
fice of Chief Counsel to produce these same statements from Worldwide.  When they were
produced, Marcusse filed them on the record to show the IRS witnesses and prosecutors
had lied at her criminal trial.  Other of the records from this bulk exhibit, GX-219,
however, are still missing and have not been provided.  There were three withdrawals
from Worldwide, i.e., $800,000 on March 15, 2001, $410,000 on March 16, 2001, and
$270,000 on March 21, 2001, for which the withdrawal forms were provided showing
"Deposit to 0529-454118", but not the corresponding deposit receipt forms signed by
Winfield Moon, who owned both Worldwide and Worldwest International, the company to
which Account 0529-454118 corresponded.  In the Presentence Report ("PSR"), it was
claimed Marcusse owned Worldwide.  At trial, pages were missing from the Worldwide
Business Account Application as well as the Certificate of Authority, as proven from
the top of the Application that showed it was "Page 1/3" of a fax from Wells Fargo
Bank.  The missing pages would have proven Winfield Moon owned Worldwide.  Agent
Flink admitted Moon owned Worldwest at the trial.  In 2006, Moon passed away.

[11] Item 7 requested copies of checks and wire transfers in support of GX-95, Agent
Flink's summary exhibit claiming Marcusse had unreported "income" of $943,370 for
taxyears 1998-2001 so that he might invent motive at the trial.  These checks and
wire transfers were later provided by the IRS Office of Chief Counsel in response
to a motion to compel  discovery on March 10, 2010, as provided by IRS Agent Goeman,
Western District of Michigan.  The Office of U.S. Attorney did not disclose to EOUSA
that the CI Division in the Western District of Michigan had these records, as shown
by William Stewart II's response on April 13, 2010 (Refer to ¶189).  Thus, Item 7
has been produced in full.

[12] Item 11 requested 10 specific wire transfer statements from 1999, which were in
support of Def. Exh. M-Z, a summary exhibit denied admission at trial that showed

89. In his April 13, 2010 response, William Stewart II, EOUSA, advised that, "The District does not have custody or possession of items 5, 7, 8, 11, 14, 15 & 16." Items 6 and 13 are ignored. This response was appealed on April 21, 2010. On September 20, 2010, Janice Galli McLeod of the Office of Information Policy responds, claiming that an "adequate, reasonable search for records responsive" to the request had been conducted.

90. On September 10, 2010, however, in response to a September 8, 2009 FOIA request for documents pertaining to Suisse Security Bank & Trust, William Stewart II, EOUSA, indicated that the bank records were being maintained by the IRS, specifically, Gary T. Prutsman, Chief of the Office of Disclosure, Washington, D.C., which would pertain to the records requested in ¶ 88, supra.

91. On October 18, 2010, a FOIA request was sent to Gary Prutsman, asking for Items 5, 6, 11, 13, and 14 from the October 6, 2009 FOIA request, as well as additional specific copies of checks from the National City Bank accounts (bulk exhibits GX-208, GX-210, GX-222).

92. On November 3, 2010, in order to meet the 60-day deadline for an appeal, Marcusse appeals the fact Gary Prutsman, IRS Office of Disclosure

---

12 (Cont.) $4,186,700 in investments made for Crawford Ltd.

13 Item 13 requested all wire transfers and checks showing payments or transfers from Access Global, LLC, or Mass Ministries, to Access Financial, Sanctuary Ministries, or MLC Development. Federal authorities had seized the bank records of associate Tom Wilkinson, signatory on Access Global, LLC, and Mass Ministries, Green Bay, Wisconsin, to obstruct them from being used at the 2005 criminal trial. Wilkinson was not charged with the rest of the defendants, apparently because he was the only one able to afford private counsel that could not be controlled by the prosecutors in Michigan, nor has he ever been charged. Prosecutors tampered with exhibit, GX-80, to remove the existence of Wilkinson as a sales manager, and obstructed him as a defense witness after he appeared to testify by claiming they would indict him if he testified.

14 Item 14 requested the copy of the wire transfer to MLC Development from Access Financial or Sanctuary Ministries sent in October or November, 1999, or 2000. At the 2005 criminal trial, prosecutors misrepresented that investments were first made in MLC in 2002, after the dates of the 39 mail fraud counts, in order to deceitfully claim the MLC investment was "irrelevant", thereby protecting Robert Plaster, the CFO of MLC, who was a friend of former U.S. Attorney General John Ashcroft that obtained investor funds from MLC and testified at trial that he kept the money.

had not responded to her request for documents from the bulk bank re-
cords.

93. On December 14, 2010, Paula M. Curren, IRS Disclosure Office, Dept.
of Treasury, responds, requesting "proof of your right to access the
requested records", further stating:

> Please be advised, wire transfer statements are not Internal Rev-
> enue Service records.  Therefore we have no documents to provide
> you in response to that portion of your request.  Your request
> for cancelled checks and wire transfers can be obtained from the
> various banks you referenced in your letter.

94. On December 20, 2010, Marcusse responds, providing the requested in-
formation, but objecting to the representation the IRS did not have wire
transfer statements or cancelled checks, because EOUSA disclosed the IRS
Office of Disclosure had the bank records, and during the 2005 criminal
trial, she had "personally viewed the 'bulk' bank record exhibits" and
they contained all of these types of documents.  She further argued IRS
Agent Flink had engaged in perjury and violations of 26 USC §7214 at
the trial by "making false claims for unreported income based on the
misrepresentation of these cancelled checks and wire transfer statements";
former associates, Diane and Wesley Boss, "who were reported to law en-
forcement for $1.5 million in embezzlement, stole original National City
Bank records and then provided them to IRS Agent Flink in return for a
plea agreement", with Agent Flink admitting under oath "they had provided
him with these documents"; and she had made requests for these documents
from the various banks via certified mail service, but had never received
any of them.

95. On December 27, 2010, Janice Galli McLeod responds, denying the ap-
peal because it was received on November 18, 2010, which was not within
60 days of the date of the letter denying the request, which was Septem-
ber 10, 2010 (See ¶90).

96. On January 6, 2011, Marcusse responds, indicating she had mailed

her November 3, 2010 appeal via certified mail no. 7007-0710-0000-0947-6976, which was date stamped by the FCI Tallahassee mailroom on November 5, 2010.  According to the USPS, the envelope was delivered on November 10, 2010 at 11:57 a.m., not November 18.

97. On February 4, 2011, Donald Davis, Disclosure Specialist, Dept. of the Treasury, responds, stating it was to the FOIA request dated October 18, 2010, that he received on January 18, 2011, "We have no jurisdiction over records maintained by banks, federal, state or local governments; therefore, I have no documents specifically responsive to your request."  Davis's letter was mailed in an envelope postmarked February 16, 2011.

98. On February 28, 2011, Davis's response was appealed, via certified mail no. 7004-1160-0004-5678-8937, further noting that it had been mailed to Marcusse in an evelope postmarked February 16, 2011.

99. On February 29, 2011, Anne D. Work, Senior Counsel, Administrative Appeals Staff, Office of Information Policy, responds to Marcusse's January 6, 2011 appeal for reconsideration (See ¶ 96), reiterating the denial was based on receiving the appeal letter on November 18, 2010, after the regulatory deadline.

100. On January 6, 2012, the IRS Office of Chief Counsel filed a motion in U.S. Tax Court in Docket 14234-09, which states that on November 16, 2010, their attorney, Erin Hines, had contacted Darline Goeman, IRS, Western District of Michigan, to locate the boxes of bulk exhibits from the criminal trial.  Goeman responded by advising Hines to contact Stephen Corcoran with the Criminal Investigation Division in the Western District of Michigan.  On November 30, 2010, Corcoran sent an email to Hines advising he was "sending nine boxes containing 'bulk exhibits'".  On December 2, 2010, the Office of Chief Counsel states it received the nine boxes of bulk bank record exhibits.

101. At the same time EOUSA had advised Marcusse that the IRS Office of Disclosure, Washington, D.C., had the bulk bank records, the records were still in the custody of Stephen Corcoran, CI Division, Western District of Michigan.  Marcusse alleges that the defendants do not want to provide the requested documents from the bulk bank records because the records prove the government's chief witness at her trial, IRS Agent Flink, committed perjury and submitted false summary exhibit evidence. Defendants' failure to make these documents available violates FOIA, 5 USC §§ 552(a)(3)(A) and 552(a)(6)(E).

SIXTH CAUSE OF ACTION

102. As Item 10 of an October 6, 2009 FOIA request, the fees paid or deals cut confidential informants, government witnesses, and other in- dividuals, such as David Paul Rendleman, Sue Jager, Lela Murphy, Christi Heuck, Robert Plaster, and Tom Wilkinson were requested.

103. On November 3, 2009, William Stewart II, EOUSA, denied the item as an unwarranted invasion of personal privacy in violation of the Priv- acy Act, 5 USC §552a, as well as for it being generally exempt under 5 USC § 552(b)(6) and (b)(7)(C).

104. On November 9, 2009, the response from EOUSA was appealed, "con- testing these accusations [of third parties] on the basis of prosecu- torial misconduct and fraud, including favortism to third-parties for political reasons".  Marcusse further advised that Robert Plaster was deceased.

105. On June 4, 2010, William Stewart II, EOUSA, provides trial trans- cript pages 2241-81 where Robert Plaster testified on June 3, 2005.

106. On June 17, 2010, this response was appealed, but it was denied on September 7, 2010 by Janice Galli McLeod, Office of Information Pol- icy, under 5 USC §§ 552(b)(6) and (b)(7)(C).

107. On September 20, 2010, Janice Galli McLeod denied the appeal regard-

-24-

ing the rest of the individuals named, stating:

> Please be advised that EOUSA did not conduct a search for the re-
> quested records pertaining to third parties.  To the extent that
> such records exist, without consent, proof of deal, official ac-
> knowledgment of an investigation, or an overriding public interest,
> disclosure of law enforcement records concerning an individual
> could reasonably be expected to constitute an unwarranted invasion
> of personal privacy.  See 5 U.S.C. § 552(b)(7)(C).

108. Individuals are not entitled to protection under the Privacy Act
where their informant status has been officially confirmed, when it
involves governmental wrongdoing, nor the aforementioned list (¶ 107).

109. In the public trial transcripts, Robert Plaster admits he kept the
funds, which were wired to MLC Development on behalf of the investors.[15]
According to the public record in a mail fraud prosecution against David
Paul Rendleman, he received a Rule 35 reduction based upon his misrep-
resentations against Marcusse and her co-defendants.[16]  Lela Murphy was
identified as a confidential informant at trial where she hid a tape re-
corder in a floral arrangement.[17]  As proven by a fax sent to FBI Agent
Samuel Moore submitted as evidence, Christi Heuck was used by Agent
Moore as a confidential informant.  When questioned as to whether he
received the fax, Agent Moore denies it 9 times before he finally admits

---

[15] Due to prosecutors misrepresenting when investments were first made in MLC, Plas-
ter was able to keep at least $1 million of investor funds without regard for criminal
prosecution or civil liability, thereby benefitting from his political contributions
to John Ashcroft and other influential Republicans during the Bush Administration.

[16] None of the public record documents (Case Nos. 1:03-cr-294-01 and 1:04-cr-265-01)
or information released to the media on November 4, 2005, regarding Rendleman's "co-
operation" was provided by EOUSA in response to Marcusse's request.  According to an
FBI Form 302, however, which was redacted to remove all names and provided on June 13,
2011, Rendleman misrepresented that co-defendant Jeff Visser was part of the Virginia
Militia, and that co-defendant George Besser was an "anti-government" type that was
"looking to cause overloads with their numerous court filings, Uniform Commercial Code
(UCC) fillings on law enforcement and government officials, investment fraud and site
draft schemes".  Rendleman's lies caused the defendants in Marcusse's case to be denied
bond, which obstructed the right to prepare an adequate defense; caused the trial judge
to order an anonymous jury under fabricated presumptions of violence; and allowed for
prosecutors to misrepresent the alleged "scheme" had continued past 2001, which was
used to mete out sentences triple the length of that which would have ordinarily ap-
plied, among other injustices.

[17] In closing arguments, defense attorney Ken DeBoer states, "He [Don Buffin] didn't
put together his own agenda and go and sit in the Murphys' kitchen where Mrs. Murphy
had the recorder under the pumpkin in the center of the table."

he received it.  Sue Jager was the confidential informant taping co-de-

fendants Wesley and Diane Boss on July 6, 2001, for Agent Moore.  Jager

was further used by prosecutors to make numerous misrepresentations at

Marcusse's sentencing hearing by inventing prior criminal activity.[18]

At the trial, AUSA Gezon stated associate Tom Wilkinson was currently

under investigation in connection with the case and would be charged if

he testified as a defense witness.[19]

110. Government witness, Patricia Dufeck, has recently admitted prose-

cutors promised if she testified a certain way, i.e., lied, she would

be compensated, except afterwards they reneged.[20]

111. Defendant's failure to make the relevant documents available vio-

lates FOIA, 5 USC §§ 552(a)(3)(A) and 552(a)(6)(E).

### SEVENTH CAUSE OF ACTION

112. As Item 12 of an October 6, 2009 FOIA request, the Western Union

records from October, 1998, to December, 2001, were requested for Mar-

cusse, Tom Wilkinson, and Dan Hammond.[21]

113. In his April 13, 2010 response, William Stewart II, EOUSA, provides

GX-98a, "Western Union Transactions Sorted by Defendant"; GX-98b, which

---

[18] Sue Jager, who had a criminal history of arson, was selected by disreputable pros-
ecutors, out of 500 investors, to deliver the victim "script" at Marcusse's October
28, 2005 sentencing hearing.  Marcusse, who was 48 years old and had no criminal his-
tory, was slandered by Jager's claims, as supplied by prosecutors eager to request a
draconian sentence, that she had put "contracts out on people's lives" and even been
charged with it, she was in the "illegal business" of "prostitution", and she wouldn't
be able to hold the hands of her elderly parents and be there for them when they died,
given the sentence she would be getting.  Marcusse's mother had unfortunately disclosed
to the probation officer her husband, Marcusse's father, was terminally ill.

[19] Tom Wilkinson has never been charged in this or any other case.  All of his bank
records, however, which contained exculpatory evidence, were seized by the FBI, mak-
ing them inaccessible to Marcusse for use during trial.  When she asked AUSA Gezon
about obtaining them, he sneered at her, telling her "good luck".

[20] Dufeck lied about investing, claiming her boyfriend Paul Blochowiak had invested
$45,000 in 1998 when the evidence showed only $15,000 was invested and all of that
had been returned before the first count in the indictment.  Dufeck lied about her
bar being in foreclosure and that Marcusse contacted her, cheating her, when she had
approached Marcusse to prevent the foreclosure.  Marcusse purchased the bar for the
investor portfolio on the day they were to lose title to it.

[21] Dan Hammond worked for Tom Wilkinson as his office manager.

listed co-defendants Buffin, Boss and Besser, and the transfers they conducted; and GX-99 and GX-99a, which listed "Currency Transaction Reports Filed on Defendants", making reference to GX-99b, which was not included.  Printouts of the contents of the money transfer statements were included for co-defendant William Flynn only.

114. While GX-99 showed Marcusse obtaining $10,300 in "cash out" and transacting $10,110 in "cash in" at the Postal Annex Plus on September 1, 1999, a Western Union facility, for example, among other transactions, she was not listed as having transacted any transfers as "Sender" on GX-98a, which was the list "sorted" by the defendants.  By omitting her from GX-98a, and prosecutors suppressing the evidence she made these transfers, Agent Flink was able to falsely attribute these funds to unreported income, and when questioned, lie under oath by claiming Marcusse took $29,356 in funds out of an ATM in increments of $300 once or twice a week throughout 2000 and 2001.[22]

115. At trial, Dan Hammond, Tom Wilkinson's office manager, testified to their having directly transferred approximately $500,000 of the $1,757,319.56 in investor funds they raised into investments under Marcusse's direction, except she was deprived of Wilkinson's bank record evidence, with prosecutors suppressing all evidence of transfers made by Hammond or Wilkinson, thereby obstructing this evidence legitimate investments had been made on behalf of investors.

116. In her April 21, 2010 appeal, Marcusse objected to not having been provided with these records, arguing it had been done to obstruct the evidence investments were made from the trial.  On September 20, 2010,

---

[22] At trial, no Form 886-A, Explanation of Items, or other similar exhibit, specifying dates, amounts, and payee, was provided for the $943,370 alleged against Marcusse in unreported income, the likely reason being it would have proven Agent Flink was lying.  Form 886-A, for example, showed a corresponding withdrawal on 9/1/99 of $10,300, further matching Def. Exh. M-Z, investments made for Crawford Ltd., which the court denied admittance because Marcusse had not "proferred" all of the underlying records in support. Form 886-A was provided when Marcusse sued in U.S. Tax Court.

Janice Galli McLeod, Office of Information Policy, responded, claiming an "adequate, reasonable search for records responsive" to the request had been conducted.

117. Defendant's failure to make these documents available violates FOIA, 5 USC §§ 552(a)(3)(A) and 552(a)(6)(E).

## EIGHTH CAUSE OF ACTION

118. As Item 15 of an October 6, 2009 FOIA request, proof was requested to show Richard Gerry was convicted of "investment fraud" by federal authorities.

119. In their response to Marcusse's motion requesting subpoenas for defense witnesses, prosecutors note "that Mr. Gerry is a convicted investment fraud operator out of Texas." This was not true, but caused court-appointed defense counsel, as no doubt intended, to withdraw Gerry as a defense witness, contrary to Marcusse's wishes.

120. Richard Gerry, had he been able to testify, could have attested to his use of James Kramer-Wilt, attorney, Bureau of Public Debt, as an advisor regarding investments. In turn, Gerry was Marcusse's investment advisor. In addition, Gerry was the registered agent on Worldwide E Capital, Winfield Moon's company, and could have testified to the $600,000 falsely attributed as unreported income to Marcusse as instead part of the $1,861,330 invested with Moon. Finally, Gerry could have testified to the wire transfers being made to MLC Development, as a director/trustee of Marcusse's company, some of which ended up in Robert Plaster's pocket.[23]

121. In 2003, the U.S. Office of Government Ethics reported Kramer-Wilt and Gerry pled guilty to the misdemeanor charges of Kramer-Wilt accepting an "illegal financial gratuity" from Gerry of $25,000.

---

[23] The other director/trustee was solicitor Gurmail Sidhu, whose home and office was raided under a falsified "drug-trafficking" search warrant in regards to Marcusse's company (See ¶58, supra). Undoubtedly, prosecutors could not afford for this bogus search warrant to be discussed in front of the jury had Gerry appeared.

122. On April 13, 2010, William Stewart II, EOUSA, responded, indicating the "District does not have custody or possession" of Item 15. When appealed, Janice Galli McLeod, Office of Information Policy, responded that EOUSA did not search for records pertaining to third-parties, citing concerns for personal privacy.

123. Prosecutors had no problem representing Gerry had been "convicted" of investment fraud. If that were true, it would be a matter of public record, and should have been produced as requested.

124. Defendant's failure to make these documents available violates FOIA, 5 USC §§ 552(a)(3)(A) and 552 (a)(6)(E).

### NINTH CAUSE OF ACTION

125. As Item 16 of an October 6, 2009 FOIA, the number of investors that had deducted their investments was requested.

126. Prosecutors had alleged in their Trial Brief filed just before the trial on May 5, 2005, that the defendants were involved in a "second scheme" in which "charitable contributions" were made to a church under their own control where the funds were then used for personal purposes. At trial, prosecutors presented two witnesses, brothers who had deducted their investment, with one of them testifying he had talked to Marcusse who had advised him to do so. Under cross examination, the witness, Stanley Krogman, not only admitted he had not talked to Marcusse, but that she had advised in an investor newsletter, which was admitted into evidence (GX-52), this was not recommended nor permissible under the law. Nevertheless, Agent Flink later testifies he had "seen it [a deduction] on various individuals' tax returns and it was told to numerous individuals." When asked how many, he states "fifty".[24]

---

[24] Agent Flink is asked, "But could you tell us if it's fifty or five hundred or two? Could you give us an idea?", to which he responds, "It would be closer to -- of those three choices, I would say fifty would be closer than two or five hundred." When asked to get it closer to what he saw rather than ballparking, he responds, "I can't recall."

127. It is alleged Agent Flink was lying about this figure, as Duane
and Stanley Krogman were the only two investors charged with misdemean-
or failure to file in regards to this case.

128. In an April 13, 2010 response, William Stewart II, EOUSA, indicated
the "District does not have custody or possession" of Item 16.  In the
September 20, 2010 response to Marcusse's appeal, Janice Galli McLeod,
Office of Information Policy, stated EOUSA did not conduct a search for
records pertaining to third-parties, citing concerns for personal privacy.

129. The Office of U.S. Attorney, Western District of Michigan, would
surely know how many misdemeanor failure to file cases it filed in re-
gards to Marcusse's case, which, is also a matter of public record.  It
is also a matter of public interest when prosecutors suborn perjury to
obtain or maintain convictions.  The record shows prosecutors voluntar-
ily withdrew their bogus ponzi scheme allegation prior to jury delibera-
tion, except they publicly claimed afterwards the jury had found it.
In her §2255 motion to vacate, where Marcusse has submitted extensive
caselaw showing the higher courts consider this an implied acquittal,
they have switched their description of the charge to "false statements".
Therefore, to prevent the government from engaging in improper post hoc
rationalizations to sustain the charges, the defendants should admit it
was only the two Krogmans rather than a fabricated 48 individuals, or
provide the documents to prove it.

130. Defendant's failure to make these documents available violates
FOIA, 5 USC §§ 552(a)(3)(A) and 552 (a)(6)(E).

TENTH CAUSE OF ACTION

131. As Item 17 of an October 6, 2009 FOIA, the original notes or re-
cords were requested for trial transcript pages and witness, (1) Leo-
nard Zawistowski, pages 804-811; (2) Steven Bolks, pages 1193-94; (3)
John Jouppi, pages 1304-1321; (4) Marcusse, pages 81-82, 1394, 3035,

3056, 3066, 3095-96, 3102-03, 3161-70, 3186, 3208, 3224; (5) Flink, page 2102, 3422-23; (6) Other, pages 137, 2220-23, 2231, 3599-3600, 3682.

132. The original notes or records, which would include audiotapes, were requested because tampering with the transcript occurred between the May 16 - June 14, 2005 trial and the publication of the trial transcripts on August 18 (Vol. I-IX) and October 11, 2005 (Vol. X-XIX).

133. Government witness Leonard Zawistowski of the Federal Reserve admitted under cross to Marcusse his employer had been involved in collapsing some Bahamian banks in 2001, such as Suisse Security Bank,[25] but this admittance was removed from the published version of the transcripts. Tampering can be proven by the seven later references to Zawistowski's admittance, which were left in the transcripts (See ¶ 53, supra).   The bad faith and unclean hands of the federal government in pursuing this prosecution could have been established by this admittance had AUSA Gezon not lied in his rebuttal closing arguments by claiming there were no bank records in evidence to show Marcusse made investments in the Bahamas program at Suisse Security Bank.   Hence, the reason Marcusse is suing to obtain Item 17, as well as the relevant bank records.[26]

134. The record shows Marcusse was only permitted 9 defense exhibits, out of the "reams" of documents court-appointed counsel admitted she

---

[25]  Investor funds, which had been placed in a managed stock trading program, were never recovered after Suisse Security Bank's license was revoked on March 5, 2001.

[26]  It should be noted that just a few weeks after Marcusse was granted permission to file a pro se supplemental brief on direct appeal on 8/8/06, SIS officer, George Williams, FCI Tallahassee, confiscated her entire trial transcript.   Until she appealed to Regional BOP in Atlanta, she was unable to secure its return.   Lt. Neel from Atlanta had to travel to Tallahassee in order to retrieve the transcript for her (Administrative Remedy No. 426890-F1).   Afterwards, Jason Stiles, Education Supervisor, took the transcript and shipped it outside the institution, not returning it until 12/29/08 (Fed. Ex. Trk# 0200-8484-5129-5015, 11/21/08).   This was two weeks after the Supreme Court denied her pro se petition.   Stiles had threatened to take Marcusse's law locker away from her if she complained about the missing transcripts.   When asked by the court in her §2255 to respond to Marcusse's allegation that prosecutors had induced "prison officials [to] engage in such dirty tactics", AUSA McManus argues on 10/14/11 the accusation was "unfounded".   Having been incarcerated in FCI Tallahassee, a prison of 1,200 women, since 12/6/05, Marcusse would state she has never seen prison officials confiscate legal papers from any other prisoner.

gave him to submit,[27] except one of them, Def. Exh. M-S, was added
through transcript tampering, as she attests she never saw it before
until the exhibit was first provided by the IRS in discovery in the
U.S. Tax Court litigation.[28]   According to the published transcript,
Def. Exh. M-S had been prepared by Agent Flink, which begs the question,
why, then, didn't he submit the exhibit during his testimony?  Def. Exh.
M-S contradicts Marcusse's testimony and her Def. Exh. M-AA, which was
submitted to show the transfers made into investments in the Bahamas
program at Suisse Security Bank.  In any event, transcript tampering
is shown in regards to court-appointed counsel, who would not have sub-
mitted evidence he knew to be fabricated, as it would risk his bar li-
cense.  Indeed, defense counsel later questions Agent Flink's figures,
accusing him of changing them during the trial, therefore, it would seem
unlikely he would have submitted an exhibit supporting them.  As the
result, Marcusse alleges transcript pages 3161-62, 3422-23, and 3599-
3600 added testimony, cross examination and arguments in support of
the addition of Def. Exh. M-S to the published transcripts.

135. Although listed as a pro se on the record, Marcusse was not per-
mitted to cross examine virtually any of the government's 26 investor
witnesses.  The cross examination of one of them, Steven Bolks, that
she was able to do, however, was deleted from the published transcripts.
Hence, the request is directed to the end of his testimony, pages
1193-94.

136. The testimony of government witness, John Jouppi, a trust attorney,

---

[27] Prosecutors pressured defense counsel to not submit Marcusse's evidence, arguing
it was "irrelevant" due to their theory of prosecution the defendants promised only
investments would be made in GX-1, a prime bank or high yield investment.  At the
final pretrial hearing, the court had ruled the defendants did not need to submit
their defense exhibits until they presented their defense at trial.

[28] During the direct appeal, the district court rejected from filing Marcusse's mo-
tion requesting copies of trial exhibits because she had court-appointed counsel.
This attorney, however, was incompetent and refused to do anything she asked of him.

pages 1304-21, originally had him admitting he did not know anything
about section 508, but it was changed to support AUSA Gezon's misrepre-
sentation of his testimony in support of tax offenses rather than a
misunderstanding of the tax code, which is not criminal behavior.[29]

137. The testimony of Bruce Marcusse, page 1394, Marcusse's ex-husband,
is tampered with to support Agent Flink's fabrication of unreported in-
come claims against Marcusse, page 2102.  Diane Boss, Bruce's sister,
embezzled $45,000 to give to him, which Agent Flink had initially at-
tributed to Boss, as shown from the preliminary hearing of July 29,
2004.  At trial, however, in his summary exhibit, GX-95, Agent Flink
increases it and switches it to Marcusse giving $50,000 to her ex-hus-
band.  The underlying checks totaled $45,000, not $50,000; were written
from the Access Financial Group account, not Marcusse's personal account;
and were signed by Boss.  Transcript tampering is shown where Bruce Mar-
cusse's reference to a joint $27,000 loan is removed from page 1394,
as shown by the cross examination of Agent Flink on page 2102, which
did not support the $50,000 amount, causing the original records for
both pages to be requested.

138. A review of Marcusse's opening statement and testimony suggests
tampering to change it in support of the prosecution's allegations,
thereby acting to obstruct later claims of **Booker** violation.[30]  Thus,
a request is made for the original records for the pages listed in para-
graph 131, supra.

139. The balance of pages for which original records are being requested
include 137, where the type of scheme alleged appears to have been
changed; 2220-23 and 2231, where Marcusse supposedly acquiesces to the

---

[29] At the jury instruction conference, AUSA Gezon admits the defendants may have
been "misreading 508(c)."

[30] In **United States v. Booker**, 432 US 220 (2005), the Supreme Court held it was a
constitutional violation if a district court enhances a defendant's sentence based
on facts not proven to a jury or admitted by a defendant.

discharge of defense witnesses she had needed, but court-appointed counsel asked the court to release; and page 3682, where the transcript is changed to show the trial judge adjourning for the evening when instead he had merely disappeared rather than respond to Marcusse's request documents and bank records she had filed in "evidence packs" be given to the jury.[31]

140. In an April 13, 2010 response, William Stewart II, EOUSA, provides copies of these transcript pages. In her appeal of April 21, 2010, Marcusse objects that she had asked for the "original" notes or records, which are required under 28 USC §753(b) to be preserved in the public record for not less than ten years. From the September 20, 2010 response to her appeal, Marcusse was unable to determine what paragraph may have been in response to Item 17, other than Janice Galli McLeod indicating that if dissatisfied with her action, a lawsuit could be filed.

141. Defendant's failure to make these documents available violates FOIA, 5 USC §§ 552(a)(3)(A) and 552(a)(6)(E).

### ELEVENTH CAUSE OF ACTION

142. As Item 1 of a May 12, 2009 FOIA, a copy of the search warrant, affidavit, and inventory of items seized from Marcusse's business attorney (solicitor), Gurmail Sidhu, was requested.

143. In a July 11, 2004 article, it was reported that Sidhu's "home and office were raided and documents and computers seized" under suspected

---

[31] When court-appointed counsel would not submit her business documents and bank record documents from the underlying bulk bank record exhibits as exhibits during her testimony, Marcusse filed some of it in "evidence packs" with the clerk of court, including some wire transfer statements to Suisse Security Bank, requesting for it to be "certified" by the clerk and the court to have the documents given to the jury. After her testimony, she had refused to close the evidence. Marcusse was unable to file all of the documents she had given to court-appointed counsel because he refused to return any of it to her. On direct appeal, AUSA Schipper misrepresents to the Sixth Circuit the records of Access Financial were never found. The judicial panel further twists this misrepresentation to find Marcusse had "destroyed" records in **United States v. Flynn,** 265 Fed Appx 434 (CA6 2008), which was a finding that could only have been made by ignoring her pro se supplemental brief and the appendix she provided in support from the underlying record proving otherwise.

"drug-trafficking" and "drug sales to people and companies all over the world", further describing it as a "mob probe" and "organised crime". While Marcusse was not named in the article, Sidhu was quoted as stating the paperwork taken away related to one of his clients, and the company mentioned was the one he had set up for her to transact investments.  In addition, the article was published shortly after Marcusse's July 1, 2004 arrest and detainment.

144. Fabricated allegations of drug-trafficking also surfaced in regards to the arrest warrant of co-defendant, George Besser, where a conspiracy to distribute 5 kilograms of cocaine was charged.[32]

145. None of the documents seized from Sidhu were ever produced by prosecutors under **Brady** or at trial, nor has a copy of the search warrant or sworn affidavit in support ever been published on a public court docket, much less disclosed or provided to Marcusse.

146. As the result, Item 4 of the May 12, 2009 FOIA, requested any National Security Letters authorized and issued in this case, along with supporting documents and affidavits.  In conjunction, Item 3 of this FOIA requested any applications, authorizations, affidavits, or other documents in regards to a classification or profiling as a "terrorist".

147. It is alleged that the refusal to acknowledge the existence of a valid search warrant or provide a copy thereof, suggests no warrant was ever issued, and instead a National Security Letter was utilized falsely invoking a link to terrorism, in an abuse of power.

148. Gurmail Sidhu, a solicitor based in Birmingham, U.K., had conducted the wire transfers to MLC Development, including the $1.2 million that had ended up in Robert Plaster's pocket, John Ashcroft's friend, the

---

[32] George Besser, who was 67 years old at the time, had retired on Social Security to live in Mexico.  He was extradited . based on documents alleging drug trafficking, except when Besser objected, AUSA Gezon attributed it to "clerical error", admitting the case was not about drugs.  FBI Agent Moore, however, at trial admitted Mexico would not have agreed to extradite  for a white collar crime.  Besser was sentenced to 20 years.

U.S. Attorney General in power at the time.  In his testimony at the preliminary hearing on July 28-29, 2004, and initially at the 2005 trial, however, in support of his bogus ponzi scheme conclusion, Agent Flink would admit to only $160,000 having been transferred to MLC Development.  It was only after numerous of the government's investor witnesses admitted under cross to having placed funds for investment based on their interest in the MLC "Showcase Branson Project", and a motion for subpoena for Plaster as a defense witness to prove investments had been made, that prosecutors called Plaster as their own last-minute witness, which caused Agent Flink to admit in rebuttal testimony that Sidhu had indeed conducted the $1.2 million transfer to MLC.  This testimony was part of the basis for a motion for judgment of acquittal and reason why prosecutors abandoned their ponzi scheme allegation.

149. Prior to trial, Marcusse had requested documents from Sidhu, but he would not respond, suggesting he had been threatened or intimidated. Having been detained pretrial, she could not call him.  Had prosecutors not been caught suborning the perjury of Agent Flink, Marcusse would have been deprived of the evidence to prove the MLC investment had been made.  As it was, in rebuttal closing, AUSA Gezon put the spin on it that Marcusse "gave" Plaster the $1.2 million as a "non-refundable deposit" on real estate, as based upon a dubious "contract Plaster submitted into evidence Marcusse had never seen before.[33]

150. There is a public interest in learning whether a sworn affidavit used in support of a search warrant contained knowingly false allega-

---

[33] The contract Plaster submitted as evidence was a one-page document purporting to sell for $45 million  real estate for which no property description was provided. There were no witnesses to the signatures of Plaster and Michael Carney, CEO, MLC Development (GX-160), and Carney had passed away on November 6, 2002.  Marcusse was not permitted to make objections at the trial, nor was she allowed to submit as evidence an entirely different contract she had with Michael Carney, as signed by him, in which he had accepted the $1.2 million wire transfer on the condition $4 million was paid in return by February 15, 2002.  Keeping Sidhu and his documents out of the trial protected the obstruction of this exculpatory evidence.

tions, particularly when it is used to seize and suppress exculpatory evidence from a criminal trial.  Missing evidence is presumed material.

151. Requests for Items 1, 3 and 4 of the May 12, 2009 FOIA were made to EOUSA, the FBI, IRS, and Dept. of Homeland Security.  On May 29, 2009, the Dept. of Homeland Security responded, indicating they had found no responsive records.  On July 16, 2009, EOUSA responded, indicating records were found in the U.S. Attorney's Office files and may or may not be responsive to the request, and would be made available to Marcusse, but that a payment of $42.00 was due.  Once the payment was received, the records would be referred to the FBI and IRS for review and a response.

152. In three different responses, Marie Twarog, Disclosure Manager, IRS, responded, indicating the documents would be withheld.[34]  These responses were appealed.  On April 12, 2011, T. Mitchell, Appeals Team Manager, IRS, responded, indicating documents were withheld under (b)(7)(C), (b)(7)(D), and (b)(3) in conjunction with IRC §6103(a).  On September 20, 2011, P. Perez, Appeals Team Manager, IRS, responded, indicating documents were withheld in full under (b)(7)(C).

153. On June 12, 2009, David M. Hardy, Section Chief, FBI, responded, indicating the material requested was in an investigative file exempt pursuant to 5 USC §552(b)(7)(A), which was appealed.  On May 29, 2010, Janice Galli McLeod, Office of Information Policy, remanded the request, finding (b)(7)(A) was not applicable to withhold the responsive records in their entirety, however, no responsive records were provided in regards to Items 1, 3 or 4 of the May 12, 2009 FOIA request.  On August 15,

---

[34] On February 18, 2011, Marie Twarog, Disclosure Manager, IRS, indicated the FBI located documents (10 pages) that originated with the IRS, withholding them under (b)(7)(C), (b)(7)(D), and (b)(3), in conjunction with IRC § 6103(a).  On June 1, 2011, Marie Twarog indicated the FBI located 58 pages that originated with the IRS, which were withheld under FOIA exemption (b)(6), (b)(7)(D), and (b)(7)(E).  On August 24, 2011, Marie Twarog indicated the FBI located 4 pages that originated with the IRS, which were withheld under FOIA exemption (b)(7)(C).

∠011, Janice Galli McLeod responded to Marcusse's appeal, indicating neither the EOUSA nor the FBI had responsive records.

154. In consideration of the fact that 6 items had been requested in the May 12, 2009 FOIA, it cannot be determined from these responses or appeals if responsive documents to Items 1, 3 or 4 were located and then withheld, or if these particular items were simply ignored.[35]

155. Whether a falsified search warrant was obtained to "raid" Marcusse's solicitor's home and office to confiscate her business records, or whether the records were obtained under an abuse of a National Security Letter, the public interest is invoked where a defendant's business records were suppressed from a trial in order to fabricate support for criminal charges.  One of the charges was specified in the indictment to be the defendants "failed to keep accurate and normal books and records of the victims' funds".  Public interest is also invoked where such governmental wrongdoing was used by the Sixth Circuit Court of appeals to find Marcusse had "destroyed" business records.[36]

156. Defendants' failure to make these documents available violates FOIA,  5 USC §§ 552(a)(3)(A) and 552(a)(6)(E).

TWELFTH CAUSE OF ACTION

157. As Item 2 of a May 12, 2009 FOIA, any applications, authorizations, affidavits, or other documents in regards to "tax protester" classification or profiling was requested.

158. On July 24, 2004, three days after Marcusse was transported to the Western District of Michigan after her July 1 arrest in Missouri,[37] she was attacked and injured by another prisoner under the falsely

---

[35] The other three items from the May 12, 2009 FOIA request are discussed in the Twelfth, Thirteenth, and Fourteenth Causes of Action herein.

[36] See **United States v. Flynn**, 265 Fed Appx 434 (CA6 2008).

[37] On September 11, 2001, Marcusse had moved to Branson West, Missouri, in order to monitor the investments made in the MLC Development "Showcase Branson Project".

planted rumors she was a "constitutionalist, snitch, and white suprema-
cist".[38]   On March 5, 2005, the trial judge who had assigned himself to
her case before an indictment was obtained, was quoted in the Grand
Rapids Press equating tax protestors with a violent white supremacist
group that had initially been suspected of the murders of Judge Lefkow's
husband and mother.[39]

159. The higher courts have found activity where federal prosecutors
inferred in front of a jury that "tax protesters" were "white suprema-
cists" to be a "foul blow", which was designed to taint the defendant
as a racist.[40]

160. At trial, Marcusse had intended to pursue the defense against the
failure to file allegations of $943,370 in unreported income that the
bank records showed the funds had been invested on behalf of the inves-
tors, except she was not permitted to use any bank records as evidence.
In keeping with his bogus ponzi scheme allegation, Agent Flink misrep-
resented that Marcusse believed the funds were not personally taxable
to her because she was a "church".

161. When Marcusse filed suit against the Commissioner of the IRS in
U.S. Tax Court in Docket 14234-09, requesting a redetermination of all
of the funds charged against her at trial, not one dollar was claimed
by her to be nontaxable because she thought she was a church.

---

[38]  When Marcusse submitted a complaint to the Jail Administrator, it was ignored.
When she tried to file a complaint with the clerk of the district court, it was not
filed until she threatened to have the sheriff serve it, at which time the court or-
dered a competency exam in retaliation.

[39]  At the time, the final pretrial hearing had been scheduled for March 25, 2005.  In
the article, the trial judge was quoted as believing, "It all started with these tax
protestors..."  Law enforcement initially suspected Matthew Hale, a federal felon, and
his group of violent white supremacists were behind the Lefkow murders.  Hale had been
convicted in 2004 for soliciting the murder of Judge Lefkow.

[40]  In **United States v. Masat**, 896 F 2d 88, 95-96 (CA5 1990), the Fifth Circuit Court
of Appeals "condemned" the voir dire where the prosecutor asked questions regarding
sovereignty and whether any members of the jury belonged to the Aryan Brotherhood,
finding it "quite prejudicial, painting Masat as a racist", because "[t]here was
actually no evidence showing Masat had any ties with the Aryan Brotherhood."

162. The 8 defendants in Marcusse's case were all middle-aged to elderly, with no criminal history. Prosecutors had no competent or legitimate evidence to allege any of them were "white supremacists".

163. The underlying record in the district court shows governmental wrongdoing, including criminal activity,[41] based upon falsely classifying or profiling Marcusse as a "tax protester".

164. Requests for Item 2 of the May 12, 2009 FOIA was made to EOUSA, the FBI, IRS, and Dept. of Homeland Security. When no documents were provided, it was appealed (See ¶¶ 151-154, supra). Similar to Items 1, 3, and 4, as previously discussed in the Eleventh Cause of Action, Marcusse has been unable to determine what response, if any, to this particular request and appeal was made.

165. Defendants' failure to make these documents available violates FOIA, 5 USC §§ 552(a)(3)(A) and 552 (a)(6)(E).

THIRTEENTH CAUSE OF ACTION

166. As Item 5 of a May 12, 2009 FOIA, the FBI Form 302's were requested.

167. On June 12, 2009, David M. Hardy, Section Chief, FBI, responded, indicating the material requested was located in an investigative file exempt under §552(b)(7)(A), which was appealed. On March 29, 2010, Janice Galli McLeod responds, remanding the request because (b)(7)(A) "is not applicable to withhold the responsive records in their entireties."

168. Beginning on February 2, 2010, David Hardy, FBI, releases Form 302's, several hundred pages at a time.[42] Each time a fee would be

---

[41] No female prisoner would ever accuse or assault another over accusations of being a "constitutionalist", demonstrating the rumor was planted, which is a criminal offense. It is criminal activity to conspire to incite violence against a pretrial detainee.

[42] On 2/2/10, 96 pages were released out of 112 reviewed, which was appealed. On 9/13/10, 246 pages were released out of 261 reviewed, requesting $14.60 in fees, which were paid and the response appealed. On 11/8/10, 348 pages were released out of 418 reviewed, requesting $34.80, which was paid and the response appealed. On 1/13/11, 184 pages were released out of 356 reviewed, requesting $18.40, which was paid and the response appealed. On 3/15/11, 288 pages were released out of 366 reviewed, requesting $28.80, which was paid and the response appealed. On 4/28/11, 261 pages were released out of 393 reviewed, requesting $26.10, which was paid and

requested and paid, until such time as the responses were not being made in good faith.  In one envelope, for example, a large amount of re-dacted bank records for co-defendant David Albrecht was provided.[43]

169. The 302's showed prosecutors suborned perjury at trial to allege various bad acts and manufacture the elements to support a showing of criminal activity.[44]  FBI Agent Moore, for example, testified he executed a search warrant on the defendants' office in December, 2001, but it was "pretty much vacant".[45]  This supported the allegation the records were never found, and that Marcusse kept or had no records.  In the September 13, 2011, envelope provided by David Hardy, FBI, there was a 302 that described the December 20, 2001 search, wherein it was disclosed a Hewlett Packard computer had been seized.  In this computer were the business records.  At trial, prosecutors submitted business records, such as GX-80, which had been tampered with in order to remove Tom Wilkinson as a sales manager, replacing him with co-defendant, Wesley Boss, to avoid a showing of selective prosecution and evidence tampering.[46]

170. While the 302's have been invaluable in establishing various acts of prosecutorial misconduct, Marcusse is indigent and has no family member that can afford the financial burden of paying for copies of 302 materials that are provided in bad faith (See ¶ 168, supra).

---

[42] (Cont.) and response appealed.  On 6/13/11, 893 pages were released out of 1,013 reviewed, requesting $89.30, which was not paid, but the response appealed.  On 9/1/11, Janice Galli McLeod responded, stating that because the $89.30 in fees had not been paid, the appeals had been administratively closed by her office.

[43] Yet another example is one package containing a copy of the March, 2002 United States Attorneys' Bulletin.

[44] One charge was conspiracy against the United States (IRS), in violation of 18 USC §371, a felony bearing a 5-year sentence (Ct. 42).  A lesser-charge offense would have been failure to file, a misdemeanor bearing a maximum one-year sentence.  By misrepresenting and suppressing evidence, prosecutors were able to allege Marcusse "destroyed" records, in support of finding the felony version of the count.

[45] Agent Flink later testified he knew the office had been moved to Branson West in October, 2001.

[46] The office secretary to the Bosses, Julie Siemen, who was not charged, was used by prosecutors to submit GX-80 and other business records.  Siemen testified records were kept of all funds, yet on appeal, AUSA Schipper represented no records were kept.

171. Under 28 CFR §16.11, a fee waiver is available for records re-
quested under FOIA.  Marcusse should have been eligible for such a
waiver.

172. Defendants' failure to make these documents available violates
FOIA, 5 USC §§ 552(a)(3)(A) and 552(a)(6)(E).

### FOURTEENTH CAUSE OF ACTION

173. As Item 6 of a May 12, 2009 FOIA, the IRS Memorandum of Interview
"MOI's" were requested.

174. Requests for Item 6 of the May 12, 2009 FOIA were made to EOUSA,
the FBI, IRS, and Dept. of Homeland Security.  When no documents were
provided, it was appealed (See ¶¶ 151-154, supra).  Similar to Items 1, 2,
3, and 4, as previously discussed in the Eleventh and Twelfth Causes of
Action, Marcusse has been unable to determine what response, if any, to
this specific request and appeal was made.

175. The investigators and chief witnesses for the government at the
2005 criminal trial were IRS agents from the Criminal Investigation
Division.  IRS Agents Flink and Corcoran took pictures of every witness
at the trial, intimidating them by asking questions about their taxes.
IRS Agents Flink and Corcoran misrepresented the disposition of at
least $12.1 million in investor funds by limiting the definition of an
investment for their summary exhibits to only a prime bank debenture,
ignoring all other investments made, such as in stocks, real estate,
and other legitimate and commonly-recognized investments.

176. Defendants' failure to make these documents available violates
FOIA, 5 USC §§ 552(a)(3)(A) and 552(a)(6)(E).

### FIFTEENTH CAUSE OF ACTION

177. On March 16, 2006, a FOIA request was made for documents in re-
gards to Senior Supervisory Agent Gerard Forrester of the FBI, who had
endorsed Suisse Security Bank & Trust, Nassau, Bahamas, on February 11,

-42-

2000, and again on January 10, 2001, attesting the bank had not been involved in any money laundering investigations.  On March 5, 2001, however, the Central Bank of the Bahamas revoked the license of Suisse Security Bank & Trust, under allegations of money laundering, causing all funds to be frozen.  According to an August 4, 2002, provisional liquidators report, there were $31,481,295 in funds "missing" due to former bank management, shareholders, and directors.  Marcusse had previously placed investor funds for investment into a managed stock trading program at Suisse Security Bank in 1998-99, which were never recovered.   The FOIA request was sent to the FBI and the Department of Justice, Criminal Division, Office of Enforcement Operations.

178. On April 11, 2006, David Hardy, FBI, responded, indicating the records were exempt under 5 USC §552(b)(b) and/or (b)(7)(C).

179. Thomas McIntyre, Director, Dept. of Justice, Criminal Division, responded, indicating no records were located responsive to the request.

180. On December 27, 2006, in Appeal No. 06-2324, Danial Metcalfe, Director, Office of Information and Privacy, replied, "I am affirming the FBI's action in refusing to confirm or deny the existence of any records responsive to your request."

181. On May 26, 2005, during the criminal trial, prosecutors had objected to Marcusse's request for Gerard Forrester as a witness for a good-faith reliance defense, attesting his "existence" was of "doubtful validity", and alleging his endorsement letters of Suisse Security Bank were fabricated.  As the result, the district court denied him as a witness.

182. On June 17, 2011, in U.S. Tax Court in Docket 14234-09, Agent Forrester's federal employment and two endorsement letters were authenticated in response to Marcusse's Request for Admissions (R. 48, 50).

183. Where investor victims were misled into making criminal complaints against Marcusse by federal prosecutors falsely claiming she had oper-

ated a ponzi scheme in which no investments were made, except Agent
Forrester's federal employment and his endorsement letters on official
FBI letterhead have now been publicly admitted in a federal court, the
public has the right to access such documents establishing unclean
hands and prosecutorial misconduct.  Agent Forrester's letters were of
a lulling nature, which resulted in investor losses when the Central
Bank of the Bahamas revoked Suisse Security's license shortly thereafter.
184. Defendants' failure to make these documents available violates
FOIA, 5 USC §§ 552(a)(3)(A) and 552(a)(6)(E).

## SIXTEENTH CAUSE OF ACTION

185. On March 16, 2006, a FOIA request was made for documents in re-
gards to Suisse Security Bank & Trust, Nassau, Bahamas, to the FBI
and U.S. Dept. of Justice, Criminal Division.
186. On April 18, 2006, David Hardy, FBI, responded that, "a search
of the automated indices to our central records system files located
no records in our Miami Field Office responsive to your FOIA request
to indicate the subject of your request has ever been of investigatory
interest to the FBI."
187. Thomas McIntyre, Director, Dept. of Justice, Criminal Division,
responded, indicating no records were located responsive to the request.
188. On June 6, 2006, the responses were appealed to the Office of In-
formation and Privacy.
189. On June 6, 2006, a FOIA request was made for documents in re-
gards to Suisse Security Bank from the Board of Governors of the Fed-
eral Reserve System.
190. On August 9, 2006, Margaret McCloskey Shanks, Associate Secretary
of the Board, responds, indicating no responsive records exist.
191. On September 8, 2009, a FOIA request was made for documents in
regards to Suisse Security Bank and Swiss Mercantile in Nassau, Bahamas,

from the EOUSA.

192. On February 17, 2010, William Stewart II, Ass't. Director, EOUSA responded, stating that a search for records in the U.S. Attorney's Office for the Western District of Michigan had revealed no responsive records.

193. On March 9, 2010, an appeal was sent to the Office of Information Policy, arguing that there had to be responsive records in that this Office of U.S. Attorney had the bank records for trial, which included bulk bank record exhibits, GX-208 and GX-210, showing wire transfers to Suisse Security Bank.  It was also argued that a Senate investigatory report discussed Suisse Security Bank, therefore, if the Senate had information, certainly the Dept. of Justice would as well.

194. On June 17, 2010, Janice Galli McLeod, Office of Information Policy, remanded the request for a further search for responsive records.

195. On September 10, 2010, William Stewart II, EOUSA, responded, indicating the bank records were being maintained by the IRS, specifically, the Office of Disclosure (See ¶ 90, supra).

195. On October 18, 2010, a FOIA request was sent to Gary Prutsman, Chief, Office of Disclosure, for copies of wire transfers to Suisse Security Bank & Trust in support of Def. Exh. M-AA showing $4,226,000 in investments made for its stock trading program.

196. On November 3, 2010, in order to meet the 60-day deadline for an appeal, Marcusse sends an appeal to the Office of Information Policy (See ¶ 92, supra).

197. On December 27, 2010, Janice Galli McLeod, Office of Information Policy, responds, claiming the appeal was received past the deadline.

198. On January 6, 2011, Marcusse responds, indicating her appeal had been sent via certified mail and delivered on November 10, not November 18 (See ¶ 96, supra).

-45-

199. On February 28, 2011, Anne D. Work, Senior Counsel, Office of Information Policy, responded, determining her office's original decision of December 27, 2010, was appropriate, but if dissatisfied, a lawsuit could be filed.

200. On June 17, 2011, a FOIA request was sent to the Board of Governors of the Federal Reserve System for any information or documents regarding Suisse Security Bank & Trust and Swiss Mercantile Bank.

201. On June 30, 2011, Jeanne M. McLaughlin, Manager, Freedom of Information Office, Board of Governors, responded, stating, "our review indicates that Suisse Security Bank & Trust was liquidated in 2001. For your convenience, I have enclosed a partial copy of the Third Report of the Provisional Liquidator of Suisse Security Bank & Trust, which was submitted to the Supreme Court of the Commonwealth of The Bahamas on August 4, 2002." If further information was sought, it was advised the Central Bank of the Bahamas could be contacted. No information was provided as to how to appeal this response.

202. The public record, including reports in the media and reports of the provisional liquidator of Suisse Security Bank, do not indicate the bank was liquidated in 2001. As late as October 25, 2005, after Marcusse's criminal trial, the Nassau Guardian reported that:

> The long-suffering depositors of Suisse Security Bank and Trust (SSBT), owned and controlled by Mohammed Harajchi, will have to wait yet again to discover if they will recover any of their money. Last Tuesday, Justice Vera Watkins granted SSBT a stay of Petition to wind up the bank...Twenty-one million dollars has allegedly been placed in two companies, mainly Suisse Security Holdings (SSH) and Suisse Security Investments (SSI). Both companies were controlled by Mohammed and Michel Harajchi and transferred to Switzerland...Thus, far, the Harajchis have refused or declined to disclose where the $21 million is located.

203. If, as Leonard Zawistowski of the Federal Reserve admitted at the 2005 criminal trial, the Federal Reserve had a hand in collapsing Suisse Security Bank in 2001 (See ¶¶ 52-53, 133, supra), the public is entitled to know it.

204. Defendants' failure to make these documents available violates FOIA, 5 USC §§ 552(a)(3)(A) and 552(a)(6)(E).

### SEVENTEENTH CAUSE OF ACTION

205. On October 19, 2010, a FOIA request was made for documents in regards to the monetary award recipients in Marcusse's criminal case, No. 1:04-cr-165, Western District of Michigan, including amount paid, name, and agency.  This request was sent to the Dept. of Treasury.

206. On November 16, 2010, Ava F. Littlejohn, Disclosure Manager, IRS, responded, denying the request under exemptions (b)(7)(D), (b)(3), and IRC section 6103(a).

207. On December 1, 2010, the response was appealed, because the disclosure Marcusse was seeking was in reference to her own tax return information, and that IRS agents in collusion with federal prosecutors fabricated unreported income claims against her in violation of 26 USC §7214, so that they might obtain monetary awards and promotions to which they were not entitled under the law.  It was further requested that if any of a list of IRS agents, FBI agents, federal prosecutors, and federal judges had not been paid awards or bonuses to so state.

208. On January 5, 2011, P. Perez, Appeals Team Manager, responded, denying the appeal.

209. On June 17, 2011, the Hastings Banner, Hastings, Michigan, reported that attorney Mike Schipper had been appointed by Gov. Rick Snyder as Barry County Judge.  Schipper had recently retired as a federal prosecutor, and the article recounted how he had won the "Case of the Year Award" for a Ponzi scheme trial, receiving "an IRS regional and national award".[47]  The case described was the Marcusse trial.

210. At the 2005 criminal trial, under cross, Agent Flink denied there are bonuses paid as the result of tax prosecutions.  It is alleged

---

[47] There was no mention of the fact prosecutors withdrew the ponzi scheme allegation before jury deliberation after getting caught lying about $7.5 million.

that Agent Flink was lying when he responded.

211. In light of the fact that on January 31, 2012, Marcusse obtained a judgment in U.S. Tax Court finding she had "zero" deficiencies for tax years 1999-2001, the same years as alleged at the 2005 criminal trial to have had $936,626 in unreported income, sufficient cause exists to allege the unreported income claims were indeed fabricated against her to invent motive for the 2005 trial.  The criminal investigation in her case should have been complete by the start of the 2005 trial, so there is no need to protect it, and in any event, AUSA Schipper has publicly confirmed awards were given by the IRS in regards to that trial, as he admits to having received them.  Therefore, given the strong show-ing of governmental wrongoing in this case, the public has the right to know to whom and the amount of awards made.

212. It has further been publicly reported that federal judges may be biased in tax prosecution trials due to the personal conflict of in-terest in obtaining a monetary award if a successful prosecution ensues.

213. The record of the Western District of Michigan contains abundant evidence to show the trial judge was biased, denying Marcusse the right to prove her innocence at every turn.  As Schipper admitted in the June, 2011, article, "There are other courts where judges are really, really biased."  If that was due to a personal financial conflict of interest, the public has the right to know.  Thus, whether Judge Robert Holmes Bell was paid a monetary award as the result of presiding over the 2005 trial, in light of the outcome in U.S. Tax Court utterly dispelling it, should be open for public viewing.

214. Defendants' failure to make these documents available violates FOIA, 5 USC §§ 552(a)(3)(A) and 552(a)(6)(E).

## EIGHTEENTH CAUSE OF ACTION

215. On April 9, 2012, a request under FOIA was sent to EOUSA for Form

USA 207, DEC 00, "Notice to Close Legal Case File", or any similar form authorizing the disposition or destruction of files in regards to Case No. 1:04-cr-165 in the Western District of Michigan.

216. On January 6, 2012, the Office of Chief Counsel, IRS, in U.S. Tax Court, Docket 14234-09, filed a "Motion to Vacate the Court's November 30, 2011 Order" for discovery. In the motion was disclosed that on February 16, 2011, shortly after the judge in Tax Court ordered discovery on January 5, 2011, Brian Delaney, Criminal Chief of the United States Attorney's Office in the Western District of Michigan, responded to attorney Jonathan Hauck's request for information by stating "some of the files had been 'purged'", causing Delaney to be unable to produce them.

217. It is Marcusse's understanding that an Office of U.S. Attorney is generally required to retain files from a felony criminal prosecution for at least 10 years. In Marcusse's case, however, the files were "purged" before that time, therefore, the individual(s) who were responsible for the decision to destroy files, particularly when she alleges they would prove her innocence, should be identified as such governmental wrongdoing is a matter of public interest.

218. On May 10, 2012, Susan Gerson, Acting Assistant Director, EOUSA, responded, assigning Request No. 12-1605 to the request for processing.

219. At no time since the initiation of this prosecution against Marcusse has there not been some type of litigation. The litigation against the Commissioner in U.S. Tax Court was initiated during the direct appeal and has been on-going until 2012.

220. Title 5 USC 552(a)(6)(A)(i) states that the agency is to make a determination within 20 days after receipt. As that deadline has passed, a lawsuit may be filed.

NINETEENTH CAUSE OF ACTION

221. Plaintiff Marcusse alleges that she also should have been provided with a Vaughn Index in the previously described 18 causes of action when the defendants failed to provide or denied her FOIA requests. See **Vaughn v. Rosen**, 484 F 2d 820 (DC Cir. 1973).  In each instance, a Vaughn Index was requested.

RELIEF REQUESTED

WHEREFORE, Plaintiff Marcusse respectfully requests that this Court:

(a) Order that defendants promptly release all documents relevant to plaintiff, as described in each cause of action herein.

(b) Order that defendants provide a Vaughn Index.

Respectfully submitted,

Date: 5/31/2012

Janet Marcusse, pro se
#17128-045
Federal Correctional Institution
501 Capital Circle, NE
Tallahassee, FL  32301

VERIFICATION

Pursuant to 28 USC §1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Date: 5/31/2012

Janet Marcusse